IN THE SUPREME COURT OF NORTH CAROLINA

 2021-NCSC-64

 No. 119PA20

 Filed 11 June 2021

 STATE OF NORTH CAROLINA

 v.
 BRANDON ALAN PARKER

 On discretionary review pursuant to N.C.G.S. § 7A-31 of a unanimous decision

 of the Court of Appeals, 269 N.C. App. 629, 839 S.E.2d 83 (2020), finding no error in

 a judgment entered on 12 June 2018 by Judge Ebern T. Watson III in Superior Court,

 Sampson County. Heard in the Supreme Court on 26 April 2021.

 Joshua H. Stein, Attorney General, by Michael T. Wood, Special Deputy
 Attorney General, for the State-appellee.

 Michael E. Casterline for defendant-appellant.

 BERGER, Justice.

¶1 On June 11, 2018, a Sampson County jury found defendant Brandon Alan

 Parker guilty of possession of a firearm by a felon. After the jury returned its verdict,

 defendant pleaded guilty to attaining habitual felon status. Defendant appealed, and

 on February 4, 2020, a unanimous panel of the Court of Appeals found no error in

 defendant’s conviction, concluding that the prosecutor’s statements during closing

 argument were not grossly improper. Defendant petitioned this Court for

 discretionary review.
 STATE V. PARKER

 2021-NCSC-64

 Opinion of the Court

 I. Factual and Procedural Background

¶2 On March 5, 2015, Michael Harbin, Carlos James, Derrick Copeland, and an

 unidentified male went to Garland, North Carolina, to purchase marijuana from Jafa

 McKoy. Harbin drove a Toyota Camry with James and Copeland inside, while the

 unidentified male followed them in a Ford Explorer.

¶3 The men arrived in Garland between 10:00 and 10:30 a.m. The unidentified

 driver of the Ford Explorer parked at a nearby apartment complex and remained

 there while Harbin, James, and Copeland drove to a house at a different location.

 When Harbin, James, and Copeland arrived, two men were standing outside.

 Copeland recognized McKoy standing near the front porch, and McKoy introduced

 the other man, who was on the porch, as “P.” Copeland described “P” as being about

 six feet and two inches tall, weighing around 240 pounds, and having “a Muslim-type

 beard, brown skin, [and] tattoo on the upper cheek.” Harbin stated that the man on

 the porch was wearing a red hat, and was “[l]ike a bigger, burley (sic) dude.”

¶4 Upon arrival, McKoy informed the men that the marijuana was not there.

 Harbin, James, and Copeland then left the house and drove to a nearby gas station

 to buy cigarettes. The three men left the gas station around 11:13 a.m. and returned

 to the house.

¶5 When they returned, McKoy and “P” were outside of the house and a compact

 car, that was not previously present, was parked outside. Copeland and Harbin
 STATE V. PARKER

 2021-NCSC-64

 Opinion of the Court

 exited the Camry while James remained inside. McKoy told Copeland that the

 marijuana was in the compact car. As Copeland and Harbin walked toward the car,

 “P” jumped off the porch, pulled out a revolver, and moved toward the Camry. At the

 same time, McKoy pulled out a gun and began firing at Copeland and Harbin.

 Copeland and Harbin escaped to the woods, and they made their way to the Ford

 Explorer parked at the nearby apartment complex. Copeland, Harbin, and the

 unidentified male traveled back to the house to look for James. After failing to locate

 James, Harbin called 911 around 12:24 p.m.

¶6 Around 12:30 p.m., Freddie Stokes, a resident of the house, returned home and

 saw a body in his driveway. Stokes called 911, and Sampson County EMS

 subsequently arrived at the house to find James dead in the driveway. James died

 from a single gunshot wound to the head.

¶7 On March 9, 2015, defendant was identified by Copeland from a photographic

 lineup as the man McKoy introduced as “P.” Copeland stated that he had eighty-five

 to ninety percent confidence in his identification of defendant.

¶8 Thirteen days after the homicide, on March 18, 2015, defendant learned that

 law enforcement was looking for him, and defendant called the police and went to the

 sheriff’s office. The same day, Agent William Brady with the North Carolina State

 Bureau of Investigation interviewed defendant. Initially, defendant denied being

 present at the house where James was killed. However, approximately seventeen
 STATE V. PARKER

 2021-NCSC-64

 Opinion of the Court

 minutes into the interview, defendant admitted he was at the house that morning

 but claimed that he left by 8:30 or 9:00 a.m. The same day that defendant was

 interviewed by Agent Brady, the State obtained a search warrant for defendant’s cell

 phone records, including defendant’s cell site data.

¶9 At trial, Copeland and Harbin testified for the State. During their testimony,

 neither Copeland nor Harbin positively identified defendant in the courtroom as the

 man they knew as “P.” The State also presented testimony from Jane Peterson, who

 was dating defendant in March 2015. Peterson testified about defendant’s

 appearance and stated that in March 2015, defendant had a close-cut beard and

 tattoos on his arm and face. During Peterson’s testimony, the State introduced, for

 illustrative purposes, a photograph of defendant’s upper torso that showed defendant

 had a tattoo on his chest. Defendant objected to the introduction of the photograph.

¶ 10 The trial court, in ruling on the admissibility of the photograph, stated the

 following:

 In this case, you have someone who has testified she
 was in a close relationship on the date in question. She’s
 also testified that she has a memory of his physical
 appearance at the time. She’s testified that over your
 suggestion that it was a peace sign, that his right hand
 appears to be raised in example of a peace sign, as a
 layperson might interpret that one way or another. And
 there’s nothing ominous about a peace sign, of course.
 That’s her layperson interpretation and her opinion of the
 sign that was given by the person in the photograph using
 their right hand.
 STATE V. PARKER

 2021-NCSC-64

 Opinion of the Court

 The individual in the photograph is bare from the
 waist up, appearing to have a white, baseball-type cap
 placed on his head and his right hand raised in some type
 of gesture. It does not show him in the company of any
 other individuals. It does not show him in a menacing or
 compromising position. It does show tattoos that she has
 now said she believes were the same, not different, than
 what she has testified about in her earlier recollections.

 The hat, itself, appears to be white in color, to have
 a brim, and then have some established marking on it that
 might represent a sports affiliate, the New York Yankees,
 of some sort. But it is a neutral color, white. And it is not
 very graphic as to what the tattoos might say or appear to
 be, but it does appear to show ink markings upon the chest
 and/or upper torso of the subject in the photograph itself.
 Those are not immutable characteristics. Those are things
 that have been placed upon an individual by choice.

 Tattoos are things that you mark yourself with by
 choice. Those are not things you are born with. And if you
 place them on your person, you do so in a way that
 permanently identifies you right, wrong, or indifferent.
 You subject yourself to that. And, in this case, any of those
 markings were placed there without any rebuttal at this
 time, not forcibly, but upon request of the individual that
 displayed them so proudly in the photograph, and that’s
 not substantially prejudicial, in my opinion. It is
 admissible for illustrative purposes.

¶ 11 In addition, the State tendered Special Agent Michael Sutton with the Federal

 Bureau of Investigation as an expert witness on historical cell site analysis and

 cellular technology. Agent Sutton testified that defendant’s phone was used on March

 5, 2015, from approximately 8:09 a.m. to 9:57 a.m. in an area of Garland that included

 the house in question. Between 9:57 a.m. and no later than 11:38 a.m., defendant’s
 STATE V. PARKER

 2021-NCSC-64

 Opinion of the Court

 phone could not be identified because it was not in use. At 11:49 a.m., defendant’s

 phone was determined to be located in Clinton, North Carolina.

¶ 12 During closing arguments, the prosecutor made the following three statements

 without objection that mentioned defendant having a chest tattoo:

 And they gave you a description of a guy, Muslim-type
 beard, big, burley (sic), larger than Jafa. They knew Jafa.
 They could tell the difference between this guy and Jafa. A
 tattoo on his chest, the same guy who was seen on the
 porch, pulling the revolver from his waistband. The same
 type of weapon that killed the victim.

 ....

 . . . The man that Michael Harbin described as a big, burley
 (sic) guy with a beard and a hat pulled low who gets up,
 pulls out a revolver, and walks towards Carlos. The man
 on the porch that Derrick Copeland described as 6’2, big
 with a beard, called P, with a tattoo on his chest, who got
 up, and pulled out a revolver, and went towards Carlos in
 the car. That’s what Mr. Copeland said.

 ....

 Ms. Peterson told you what the defendant looked
 like back on March 5, 2015. He looks a little different today.
 But she told you that back in March of 2015 he looked like
 this big, burley (sic) guy with a beard, even a low hat and
 a tattoo on his chest, just like Mr. Copeland told you.

¶ 13 Prior to closing arguments, the trial court instructed the jury as follows:

 The final arguments of the lawyers are not evidence but
 are given to assist you in evaluating the evidence. . . .

 ....

 . . . Now if, in the course of making a final argument, a
 STATE V. PARKER

 2021-NCSC-64

 Opinion of the Court

 lawyer attempts to restate a portion of the evidence and
 your recollection of the evidence differs from that of the
 lawyer, you are as jurors in recalling and remembering the
 evidence, to be guided exclusively by your own recollection
 of the said evidence.

¶ 14 During the jury charge after closing arguments, the trial court similarly

 instructed the jury as follows:

 Now, members of the jury, you have heard the
 evidence and the arguments of counsel. If your recollection
 of the evidence differs from that of the attorneys, you are
 to rely solely upon your recollection. Your duty is to
 remember the evidence, whether called to your attention or
 not.

¶ 15 Defendant was found guilty of possession of a firearm by a felon and not guilty

 of the remaining charges. Defendant subsequently pleaded guilty to attaining

 habitual felon status, and he was sentenced to a minimum of 105 months to a

 maximum of 138 months in prison. Defendant entered notice of appeal.

¶ 16 In a published opinion filed February 4, 2020, the Court of Appeals determined

 that the State’s closing argument did not constitute prejudicial error and that

 defendant failed to show that trial court erred in not intervening ex mero motu. State

 v. Parker, 269 N.C. App. 629, 639, 839 S.E.2d 83, 90 (2020). Defendant filed a petition

 for discretionary review, which this Court allowed on June 3, 2020.

 II. Analysis

¶ 17 “Arguments of counsel are largely in the control and discretion of the trial

 court. The appellate courts ordinarily will not review the exercise of that discretion
 STATE V. PARKER

 2021-NCSC-64

 Opinion of the Court

 unless the impropriety of counsel’s remarks is extreme and is clearly calculated to

 prejudice the jury.” State v. Huffstetler, 312 N.C. 92, 111, 322 S.E.2d 110, 122 (1984).

 “When defendant does not object to comments made by the prosecutor during closing

 arguments, only an extreme impropriety . . . will compel this Court to hold that the

 trial judge abused his discretion in not recognizing and correcting ex mero motu an

 argument that defense counsel apparently did not believe was prejudicial when

 originally spoken.” State v. Richardson, 342 N.C. 772, 786, 467 S.E.2d 685, 693

 (1996).

 The standard of review for assessing alleged
 improper closing arguments that fail to provoke timely
 objection from opposing counsel is whether the remarks
 were so grossly improper that the trial court committed
 reversible error by failing to intervene ex mero motu. In
 other words, the reviewing court must determine whether
 the argument in question strayed far enough from the
 parameters of propriety that the trial court, in order to
 protect the rights of the parties and the sanctity of the
 proceedings, should have intervened on its own accord and:
 (1) precluded other similar remarks from the offending
 attorney; and/or (2) instructed the jury to disregard the
 improper comments already made.

 State v. Jones, 355 N.C. 117, 133, 558 S.E.2d 97, 107 (2002) (citation omitted).

¶ 18 A “[g]rossly improper argument is defined as conduct so extreme that it renders

 a trial fundamentally unfair and denies the defendant due process.” State v. Fair,

 354 N.C. 131, 153, 557 S.E.2d 500, 517 (2001). A “trial court is not required to

 intervene ex mero motu unless the argument strays so far from the bounds of
 STATE V. PARKER

 2021-NCSC-64

 Opinion of the Court

 propriety as to impede defendant’s right to a fair trial.” State v. Smith, 351 N.C. 251,

 269, 524 S.E.2d 28, 41 (2000) (quoting State v. Atkins, 349 N.C. 62, 84, 505 S.E.2d 97,

 111 (1998)).

¶ 19 Defendant contends that the three statements referencing defendant’s chest

 tattoo were not supported by the evidence, and as a result, the trial court committed

 reversible error when it failed to intervene ex mero motu. In essence, defendant

 argues that in the absence of intervention by the trial court ex mero motu,

 misstatements of evidence by an attorney during closing arguments entitles the

 opposing party to a new trial. We decline to impose a perfection requirement on the

 attorneys and trial courts of this State, ever mindful that parties are “entitled to a

 fair trial but not a perfect one.” State v. Branch, 288 N.C. 514, 536, 220 S.E.2d 495,

 510 (1975) (quoting Lutwak v. United States, 344 U.S. 604, 619 (1953)), overruled on

 other grounds by State v. Adcock, 310 N.C. 1, 310 S.E.2d 587 (1984).

¶ 20 Here, rather than stating that the individual on the porch identified as “P” had

 a tattoo on his face, the prosecutor stated that the tattoo was on his chest. At trial,

 Copeland, Harbin, and Peterson all testified to defendant’s appearance. While there

 was evidence admitted that showed defendant had a chest tattoo, neither Copeland

 nor Harbin identified “P” as having a chest tattoo. Copeland described the man on

 the porch as being about six feet and two inches tall, weighing around 240 pounds,

 and having “a Muslim-type beard, brown skin, [and] tattoo on the upper cheek.”
 STATE V. PARKER

 2021-NCSC-64

 Opinion of the Court

 Harbin stated that the man on the porch was wearing a red hat pulled low and had a

 bigger, burly build. According to Harbin, this was the individual that pulled out a

 revolver, jumped off the porch, and walked towards the Camry.

¶ 21 Defendant admitted to being at the house the morning of March 5, 2015, and

 defendant’s cell site data placed his phone in the vicinity of the house on the morning

 of the shooting and traveling away from the location in the hours following the

 incident. Two witnesses placed an individual matching defendant’s appearance at

 the scene. Those characteristics were confirmed by Peterson as matching defendant’s

 appearance in March 2015.

¶ 22 This Court has found that “improper remarks include statements of personal

 opinion, personal conclusions, name-calling, and references to events and

 circumstances outside the evidence, such as the infamous acts of others.” Jones, 355

 N.C. at 131, 558 S.E.2d at 106.

 [I]n cases of clear-cut violations—those couched as appeals
 to a jury’s passions or that otherwise resulted in prejudice
 to a defendant—this Court has not hesitated to overturn
 the results of the trial court. State v. Smith, 279 N.C. 163,
 165–67, 181 S.E.2d 458, 459–60 (1971) (reversing
 defendant’s rape conviction because of the prosecutor’s
 “inflammatory and prejudicial” closing argument, in which
 the prosecutor described defendant as “lower than the bone
 belly of a cur dog”); see also State v. Miller, 271 N.C. 646,
 659–61, 157 S.E.2d 335, 344–47 (1967) (holding that the
 prosecutor committed reversible error by, inter alia, calling
 defendants “storebreakers” and expressing his opinion that
 a witness was lying).
 STATE V. PARKER

 2021-NCSC-64

 Opinion of the Court

 Id. at 129, 558 S.E.2d at 105; see also State v. Ward, 354 N.C. 231, 266, 555 S.E.2d

 251, 273 (2001) (holding that the trial court erred in not intervening ex mero motu

 when the prosecutor impermissibly commented on the defendant’s right to remain

 silent during sentencing by stating, “he decided just to sit quietly. He didn’t want to

 say anything that would ‘incriminate himself’ ”).

¶ 23 The statements in this case stand in stark contrast to remarks this Court has

 previously held to be grossly improper. This is not the case where an attorney

 engages in name-calling, makes statements of opinion, intrudes upon constitutional

 rights, or references events outside of the evidence. See Jones, 355 N.C. at 131, 558

 S.E.2d at 106. This is a case where an attorney mistakenly summarized evidence

 during her closing argument. Nothing in the record suggests that the prosecutor’s

 misstatements about the location of the tattoo were intentional, much less “clearly

 calculated to prejudice the jury.” Huffstetler, 312 N.C. at 111, 322 S.E.2d at 122. We

 fail to see how the conflation of the location of defendant’s tattoos in conjunction with

 the other evidence of defendant’s appearance at trial was an extreme or gross

 impropriety. See Fair, 354 N.C. at 153, 557 S.E.2d at 517.

¶ 24 Defendant further contends that statements and arguments by attorneys to

 the jury may be afforded greater weight and that the danger of unfair prejudice
 STATE V. PARKER

 2021-NCSC-64

 Opinion of the Court

 results from even unintentional misstatements of the evidence.1 However, the plain

 language of the trial court’s instructions to the jury acknowledges and contemplates

 that attorneys may mistakenly summarize the evidence during closing arguments.

¶ 25 The jurors were specifically instructed that they were to “be guided exclusively

 by [their] own recollection” of the evidence any time their “recollection of the evidence

 differs from that of the attorneys.” The jury heard the instructions immediately

 before and after closing arguments. “Jurors are presumed to follow the instructions

 given to them by the court.” State v. Price, 344 N.C. 583, 593, 476 S.E.2d 317, 323

 (1996) (quoting State v. Johnson, 341 N.C. 104, 115, 459 S.E.2d 246, 252 (1995)).

 There is no evidence in the record from which we can conclude that the jurors failed

 to follow the trial court’s instructions concerning the manner in which they should

 consider closing arguments by counsel.

¶ 26 Moreover, defendant’s argument would permit attorneys to sit back in silence

 during closing arguments but then claim error whenever a trial court fails to address

 or otherwise correct a misstatement of the evidence. See generally State v. Tart, 372

 N.C. 73, 81, 824 S.E.2d 837, 842–43 (2019) (“In circumstances in which a defendant

 in his or her role as an obvious interested party in a criminal trial fails to object to

 the other party’s closing statement at trial, yet assigns as error the detached trial

 1 The opposite may well be true. Jurors may be distrustful of attorneys who repeatedly

 misstate the evidence, thus, compromising the prospect of a successful outcome.
 STATE V. PARKER

 2021-NCSC-64

 Opinion of the Court

 judge’s routine [silence] during closing arguments in the absence of any objection,

 this Court has consistently viewed the appealing party’s burden to show prejudice

 and reversible error as a heavy one.”). Trials are not carefully scripted productions.

 Absent extreme or gross impropriety in an argument, a judge should not be thrust

 into the role of an advocate based on a perceived misstatement regarding an

 evidentiary fact when counsel is silent.

¶ 27 The misstatements by the prosecutor appear to be mistakes in arguing the

 evidence admitted at trial for which defendant did not lodge an objection, and

 defendant has failed to meet his heavy burden. Based on the circumstances

 presented in this case, the misstatements by the prosecutor during closing arguments

 were not extreme or grossly improper, and the trial court did not abuse its discretion

 when it declined to intervene ex mero motu. Accordingly, we affirm the decision of

 the Court of Appeals.

 AFFIRMED.